IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. GJH-19-68 |
| | * | |
| KENO ROMARIO BROWN, | * | |
| | * | |
| Defendant | * | |

\*\*\*\*\*\*\*

## GOVERNMENT'S SENTENCING MEMORANDUM

On February 11, 2019, defendant Keno Brown was charged in a federal indictment with conspiracy to commit wire and mail fraud, wire fraud, and mail fraud, in violation of 18 U.S.C. §§ 1349. In March 2020, following a seven-day jury trial, Brown was convicted of all counts in the indictment. This memorandum describes the evidence introduced at trial, and provides the government's sentencing guideline calculation and Section 3553(a) analysis. For the reasons that follow, the government asks that the Court sentence Brown to 192 months in prison and three years of supervised release.[1]

## The Conspiracy

The evidence introduced at trial proved that Brown, coconspirator Onijah Crighton ("Crighton"), coconspirator Travis Ennis ("Ennis"), and others executed an advance fee

---

[1] The government provided its description of the trial evidence to the probation officer, who adopted that description into the Present Report ("PSR") at ¶¶ 6 to 20.

lottery scheme.[2] The coconspirators called and emailed elderly victims throughout the country and posed as representatives of lottery and sweepstakes companies, including the Publishers Clearing House and Mega Millions.[3] The coconspirators then falsely represented to the victims that they won prizes, but that to collect their prizes the victims had to pay fees and taxes in advance.

Once the victims agreed to make the fraudulent payments, Brown and his coconspirators directed their victims to wire money through money transfer services (including RIA Financial, MoneyGram, and Western Union), send cash or checks through the mail, deposit money into bank accounts Brown controlled, and deposit money onto prepaid debit cards that ended up in Brown's possession.[4] Brown also exploited runners who collected fraudulent advance payments on his behalf. The prizes weren't real, and by the time the government disrupted the conspiracy, Brown and his conspirators had defrauded more than 100 elderly victims. Sent. 1, Sent. 2.[5]

---

[2] Crighton and Ennis were charged in a separate indictment. *United States v. Onijah Crighton et al.*, PX-17-606 (D. Md.). Crighton accepted an early plea pursuant to Rule 11(c)(1)(C) and was sentenced to 57 months' imprisonment. Ennis was murdered before trial.

[3] Representatives from Publishers Clearing House and Mega Millions testified that neither Brown nor Crighton worked for their organizations, that they don't alert prize winners over the phone, and that they never ask winners to pay fees and taxes in advance.

[4] RIA Financial is Walmart's money transfer service. A representative from the company testified that each RIA Financial money transfer creates an interstate wire.

[5] In addition to the electronically-filed version of Exhibit Sent. 1, the government has provided a native version of this exhibit to the Court.

### Victim Names and Contact Information

Brown normally acquired the names and contact information of the victims he targeted over the internet. For example, cooperating defendant Ronald Mendleski sold lead lists—catalogues of senior citizens' names, personal identifying information, and contact information—to Crighton, who then forwarded those lists to Brown. Ex. 5.26-27. Though Crighton was Mendleski's point of contact, Brown did not exclusively rely on Crighton for victim information. Communications seized from the account longlife1965@gmail.com ("the longlife email account") showed Brown negotiating the purchase of his own lead lists from a man who went by the name "Paul Laposta," then forwarding those lists to Crighton. Ex. 5.14-15.[6] In some instances, Brown acquired lead lists that he forwarded to unknown members of the conspiracy. *E.g.*, Ex. 5.28, 5.30, 5.33.

Once Brown obtained lead lists containing the names and contact information of the victims he targeted, Brown saved those lists to his laptop—a Lenovo computer FBI agents found while searching Brown's residence in May 2018—and the Google Drive associated with the longlife email account. Ex. 1.1, 7.1-3, 6.1-7. One of those lead lists contained the name and phone number of Edna Stubits ("Stubits"), who testified that she was the victim of a lottery scheme. Ex. 6.1a.

---

[6] Substantial evidence proved that this account belonged to Brown. Emails sent to the longlife email account were addressed to "Keno" or "Keno Brown." Ex. 5.2-13. Brown, a Jamaican national, reported this account as his email address on an immigration application he submitted to United States Citizenship and Immigration Service. Ex. 44.1a, 44.1c. Brown used this email address to register a corresponding iCloud account that contained photographs of Brown. Ex. 31.1. Brown even had the words "long" and "life" tattooed on his hands. Ex. 10.11.

## Paul Gredler

Paul Gredler ("Gredler")—a retired CIA officer with multiple sclerosis—was the first victim to testify. In 2013, Gredler began receiving emails and phone calls from several individuals who told Gredler that they were from Publishers Clearing House and that Gredler won a sweepstakes. For instance, Gredler received a series of fraudulent emails from the address hotskullz@gmail.com, an account that the evidence connected to Crighton. In one email sent on November 19, 2013, the author told Gredler that Gredler won a $10 million prize from Publishers Clearing House and that an "Internal Revenue agent" named Henry Washington would "handle [Gredler's] file." Ex. 2.2. Internet protocol ("IP") records show that this email was sent from Brown's residence, and specifically from an IP address that Brown used to access his own Facebook account. *Id.*, Ex. 37.1, 15.1, 45.1-2, 32.8, 41.1, 41.7.

In December 2013, Gredler received several calls from a purported IRS agent named Henry Washington, who called from a phone number ending in 6256 and told Gredler that he needed to pay an additional release fee to obtain his prize. Ex. 12.6, 12.7.[7] Phone and internet service provider records show that Brown subscribed to the 6256 number using the alias "David Washington," and used that phone number to register his Comcast account, which at the time was assigned to an IP address from which Brown accessed his Facebook account. Ex. 35.6, 37.3, 32.9. Cell phone location records also show that the 6256 number

---

[7] Using the Henry Washington alias, Brown also sent Gredler a fraudulent document bearing the IRS's insignia that represented to Gredler that his prize had been placed in a "holding facility" and that the release fee would be $5,000. Ex. 2.4.

4

pinged off the area of Brown's residence, often late at night when Brown was presumably home. Ex. 40.10.[8]

After paying more than $110,000 to Brown and his coconspirators, Gredler reported the fraud to federal agents, who made a controlled delivery of a debit card in Gredler's name to the individuals defrauding Gredler. Ex. 13.1. The agent who acted as the undercover postal worker identified Brown and Crighton as the two individuals to whom he delivered the debit card. Ex. 13.8-9. After signing for the debit card, Crighton and Brown got into a car and drove away. As Crighton and Brown drove off, Brown threw the packaging for the debit card from the window of the car. Ex. 1.25. Forensic experts then lifted Brown's fingerprints from the inside of that packaging. Later that day, Brown walked into an Exxon station with Crighton, who attempted to withdraw money from the controlled debit card. Ex. 13.6-7.

### Brown's Runners

Several of the conspiracy's runners testified against Brown. Those witnesses variously recalled that on Brown's behalf, they received packages, bank counter-deposits, electronic money transfers, and debit cards that they remitted to Brown. In some instances, Brown's runners testified that they heard Brown on the phone telling people that they won prizes and directing those people to send money to Brown. The following recounts the evidence related to those witnesses.

---

[8] The FBI case agent—who had spoken to Brown more than a dozen times—identified Brown's voice on the recordings between the 6256 number and Gredler.

### I.   *Elizabeth Dosumu*

Elizabeth Dosumu ("Dosumu") is the mother of one of Brown's children. FedEx records show that in 2017 and 2018, victim Norman Eck ("Eck") mailed packages to Dosumu at Brown's residence in Hyattsville, Maryland and Dosumu's residence in Brentwood, Maryland. Ex. 16.5-8. Bank records show that Dosumu was the signer on a Bank of America account ending in 4353 ("BOA 4353") that received counter-deposits from elderly victims who lived all over the country, including Lorraine Smetona ("Smetona") and Joanne Hink ("Hink"). Ex. 18.1-3, 18.5. And records from RIA Financial show that in 2017, victims Margit Blalock ("Blalock"), Mary Moorman ("Moorman"), and Ei Takahashi Ramos ("Ramos") wired money to Dosumu. Ex. 40.1. In essence, Dosumu testified that (whether knowingly or not) she was a runner for Brown. Dosumu recounted that she gave Brown the two FedEx packages Eck mailed to Dosumu's Brentwood residence, and that Brown often controlled the debit card for BOA 4353, though she opened and used the account.

### II.   *Jasmine Barkley*

Jasmine Barkley ("Barkley") is also the mother of one of Brown's children. Barkley testified that she overheard Brown using a flip phone to tell someone that he won a sweepstakes, a car, and potentially the lottery. Barkley testified that Brown had debit cards mailed to her residence, and once physically abused Barkley because she opened some of the debit cards. Barkley also recounted that she received money on Brown's behalf through money transfer services. RIA Financial and MoneyGram records show that Barkley

received wire payments from elderly individuals throughout the country, including Eck, Donald Vance ("Vance"), and Carolyn Waldroup ("Waldroup"). Barkley testified that she remitted this money to Brown.[9]

### III. *Ceante Barkley*

Ceante Barkley ("Ceante") was Barkley's sister, and was romantically involved with Crighton. Ceante testified that Brown and Crighton had over 100 debit cards in the names of people she did not know sent to her residence, and that she made Western Union payments on Brown's behalf (because Brown falsely represented to her that he didn't have identification). *Cf.* Ex. 10.10. Ceante also remembered hearing Brown on the phone talking in an American accent, saying things like "you've won a sweepstakes," and telling people that if they wanted to collect their money, they had to provide Brown with their social security numbers.

### IV. *Alexis Moore*

Alexis Moore ("Moore") was romantically involved with Brown. Though she had to be impeached with her grand jury testimony, Moore testified that she heard Brown on the phone speaking in an altered voice and telling that person that he won the lottery. Moore also testified that she wired money on Brown's behalf.

---

[9] Barkley began receiving electronic money transfers on Brown's behalf no later than July 10, 2013, when Vance wired $1,500 to Brown. Ex. 40.2. In June and July 2014, Barkley received two wire transfers from Waldroup. *Id.* Notably, Barkley was born in November 1996, making her a minor when Brown first began using her to insulate himself from the fraudulent wire payments. Ex. 47.8.

V.  *Michael Louis*

Michael Louis ("Louis") was the final runner who testified. Louis met Brown in 2016, and shortly thereafter went into debt with Brown. To resolve his debt, Louis allowed Brown to use his bank accounts to receive counter-depots from people Louis did not know. For instance, 16 counter-deposits from around the country were made into Brown's Bank of America account. Ex. 61.1-2, 61.4. Another 10 counter-deposits were made into the Wells Fargo account Brown shared with his wife. Ex. 61.5-7, 61.10.[10] RIA Financial and Western Union records show that victims Moorman and Blalock wired money to Louis. Ex. 40.1, 40.3.[11] Louis testified that he remitted the counter-deposits and electronic money transfers to Brown.

## Testifying Victims

The following victims testified at trial, either in person or by way of video deposition. Those victims uniformly testified that someone contacted and persuaded them that they had won a prize and to pay advance frees to collect those prizes. The victims also

---

[10] Some of those deposits were from Rutherfordton, North Carolina, where Blalock resided. Blalock kept handwritten notes regarding her payments that included Louis's wife's name. Ex. 43.5, 43.5a, 43.7.

[11] Louis testified that he eventually told Brown that he wouldn't continue to receive money on Brown's behalf. Brown was nonetheless persistent. For instance, Brown went to Louis's place of employment to convince Louis to rejoin the conspiracy. Even though Louis rejected this proposition, the evidence indicated that Brown continued to use Louis's identity. Specifically, when federal agents arrested Brown, they found a debit card in Louis's name on Brown's person. Ex. 60.8. Louis testified that he had never before seen the card agents recovered from Brown.

uniformly testified that they never received prizes or recovered their money. Independent of their testimony, the evidence connected the victims directly to Brown.

- Eck testified that he sent packages of money and transferred money electronically to "Keno Brown" in Maryland to collect his prize. FedEx records show that in late 2017 and early 2018, from his home in Colorado Springs, Eck sent three packages to Brown at Brown's addresses, three packages to Dosumu at Brown's address, and two packages to Dosumu's address. Ex. 16.1-8. Dosumu testified that she provided the packages from Colorado Springs to Brown.[12] RIA financial records also show that Eck wired money directly to Brown and Barkley. Ex. 40.1 Eck recalled paying between $70,000 and $80,000 to collect the fictitious prize.

- Blalock testified that she paid around $20,000 to someone she believed to be working for Publishers Clearing House. RIA Financial records show that in July 2017, Blalock sent a $390 Walmart money transfer to Dosumu. Ex. 40.1 Blalock also kept handwritten notes showing that she made "Walmart to Walmart" payments to Louis in Hyattsville. Ex. 43.5. As described below, the FBI found a digital note in Brown's iCloud account containing Blalock's phone number. Ex. 9.3.

- Smetona sent money through the mail and made counter-deposits into a Bank of America account to pay for her fictitious prize. On May 31 and June 1, 2017, BOA 4353 (the account in Dosumu's name that Brown partially controlled) received $1,400 and $4,500 counter-deposits from Smetona. Ex. 18.3.

- Stubits testified that she sent money orders to Maryland and wired money to receive her prize from Publishers Clearing House. When testifying, Stubits recalled that the man who directed her to send the money had an accent as though he were from the "islands," referring to the Caribbean, where Brown's home country of Jamaica is located. RIA Financial records show that in November and December 2015, Stubits sent five money transfers directly to Brown. Ex. 40.1. The FBI also found a lead list containing Stubits's name and phone number in Brown's Google Drive account (the account associated with the longlife email account). Ex. 6.1a.

---

[12] Eck's daughter also testified that her father was the victim of a lottery scheme and that Eck asked her to drive him to Walmart so that he could send money to collect his prize.

- Ramos testified that she sent money through Walmart to receive her prize. RIA Financial records show that in January 2017, Ramos sent a $500 Walmart money transfer to Dosumu. Ex. 40.1.

- Hink testified that she made counter-deposits at a Bank of America branch in Redmond, Oregon to receive her $8.9 million prize. In June 2017, a $3,000 counter-deposit was made into BOA 4353 at a Bank of America branch in Redmond. Ex. 18.3. Bank system records show that Hink presented her driver's license to the teller when making this deposit. Ex. 18.5.

- Siosi Tapani ("Tapani") recalled paying someone named Ben Wilson fees for her prize. To collect the prize, Tapani sent money orders and electronic payments through money transfer services to people in Maryland. Tapani remembered sending money to "Keno Brown" in Hyattsville. RIA Financial records show that Tapani sent a $250 money transfer to Brown in April 2015.

- Moorman recalled paying approximately $20,000 through Walmart to collect her prize. Moorman also remembered sending money to Hyattsville, where Brown resided. RIA Financial records show that in June 2017, Moorman sent a $440 Walmart money transfer to Dosumu. Ex. 40.1. Moorman also kept handwritten notes showing that she made payments through Walmart to Dosumu and Louis. Depo. 17.

- Vance testified that he paid between $60,000 and $80,000 in fees to collect his prize. Records from MoneyGram show that in July 2013, Vance wired money to Barkley. Ex. 40.2.

- Waldroup recalled wiring approximately $3,000 in fees to someone she believed to be a representative of Publishers Clearing House to collect her prize. MoneyGram records show that in June and July 2014, Waldroup made a series of electronic money transfers to Brown and Barkley. Ex. 40.2.

- Christopher Rubicam ("Christopher") was the son of deceased victim Benjamin Rubicam ("Rubicam"). According to Christopher, for years his father made payments for a fictitious lottery prize, often to a man who represented himself to be an attorney. Western Union records show that Rubicam made dozens of electronic money transfers to Brown. Ex. 40.3. The evidence also indicated that Brown directed Rubicam to send him funded debit cards. For instance, from the longlife account, Brown sent Card USA an email that read "MY name is Benjamin Rubicam my card close with some cash and I would like to know hw I go abt getting my cash?" Ex. 5.16.

10

**Brown's Digital Notes, Google Searches, & Internet Activity**

Using his iCloud account—an account that contained photographs of Brown and was registered with the longlife email address—Brown created the following digital notes:

- "Mary moorman" on June 5, 2017. Moorman was the victim who sent money to Dosumu, Louis, and Brown's residence in Hyattsville. Ex. 9.5.

- "828286-3874" on July 7, 2017. Ex. 9.3. This was Blalock's phone number. Ex. 43.9.

While logged onto the longlife email account, Brown conducted the following Google searches. Ex. 4.3-7.

| Type | Date | Description |
| --- | --- | --- |
| Search | 9/10/14 | andy goldberg from pch[13] |
| Search | 9/9/14 | publisher clearing |
| Search | 11/30/13 | letter from the IRS informing a person |
| Search | 11/26/13 | telemarketing script |
| Search | 11/21/13 | a letter from the IRS informing a person |
| Search | 11/20/13 | a letter from the IRS informing a person about their mega millions winners |
| Search | 11/19/13 | american dreams sweepstakes |
| Search | 11/19/13 | sweepstakes leads broker |
| Website | 11/19/13 | www.freshlotteryleads.com |
| Search | 11/19/13 | mega millions account number for sale |
| Search | 11/19/13 | mega millions calling number |
| Search | 11/19/13 | official letter from the mega millions |
| Search | 11/19/13 | a official letter from the publisher clearing house |

---

[13] Andy Goldberg was the Chief Executive Officer of Publishers Clearing House.

**Sentencing Guidelines, Section 3553(a), & Recommendation**

The relevant guideline provision is Section 2B1.1. The base offense level is 7 with a corresponding 14 to 18 level increase for causing an intended loss of greater than $550,000, and potentially greater than 3.5 million. U.S.S.G. § 2B1.1(a) and (b)(1). Sent. 1. To explain the difference, records alone—without the benefit of witness statements—show $803,599 in fraudulent proceeds going directly to Brown, his runners, and his immediate coconspirators. If the Court gives the government the benefit of witness statements (e.g., Tapani's statement that she lost $100,000 to the scheme), then the loss is in excess of $3.5 million. For the purpose of this memorandum, the government will calculate the guideline range based on the more conservative loss amount of $803,599.

At least three enhancements under Section 2B1.1 apply, including the two-level enhancements for 10 or more victims, Brown's misrepresentation that he was acting on behalf of the IRS, and sophisticated means. *Id.* § 2B1.1(b)(2), (9), and (10). Several Chapter III adjustments increase Brown's offense level, including a two-level adjustment because the offense involve vulnerable victims, a four-level adjustment because Brown was a leader or organizer of criminal activity that involved five or more participants or was otherwise extensive, and a two-level adjustment because Brown used a minor to commit the offense. *Id.* §§ 3A1.1(b), 3B1.1(a), and 3B1.4.

Brown is not entitled to credit for acceptance of responsibility. Therefore, the adjusted offense level should be no less than 35. Because Brown is in Criminal History

Category II (PSR ¶ 44), the advisory guideline range is at least 188 to 235 months' imprisonment.

With respect to the Section 3553(a) factors, Brown executed an unbelievably callous scheme. For years on end, Brown systematically manipulated and defrauded vulnerable senior citizens, used runners—including at least one minor—to launder his fraudulent proceeds, and at times committed acts of violence to achieve his criminal ends. As the testimony of the witnesses made clear, this offense inflicted an incredible amount of pain on Brown's victims and their families, all without anything in Brown's background that would militate in favor of a lesser sentence.

In particular, Brown's mother and half-sister are nursing assistants, and his remaining siblings are professionals and members of the U.S. Armed Forces. Brown is in good mental and physical health, and far from growing up in abject poverty with no hope for employment, Brown had the opportunity to work for his mother's transportation company. Given the lack of mitigating evidence, and the need to deter others from exploiting the same vulnerable segment of society, the government asks that the Court impose a guideline sentence of 192 month' imprisonment.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/ Gregory Bernstein
Gregory Bernstein
Dana Brusca
Lindsay Kaplan